**MORRISON COHEN LLP**
Alvin C. Lin (ID: 017502000)
Jason P. Gottlieb (pro hac vice forthcoming)
Collin A. Rose (pro hac vice forthcoming)
909 Third Avenue
New York, New York 10022
212-735-8600

*Attorneys for Plaintiffs Raj Patel, Ravpreet Bharmra Singh,*
*Parthive Patel, and NYC Transportation Regional Center*
*LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RAJ PATEL, RAVPREET BHAMRA SINGH, PARTHIVE PATEL, and NYC TRANSPORTATION REGIONAL CENTER, LLC, <br><br> Plaintiffs, <br><br> -against- <br><br> INFINITY MULTIVENTURES INC., SANJAY DAYMAN, VAIBHAV MANEK, and SANDEEP MEHTA, <br><br> Defendants. | No.: <br><br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Raj Patel, Ravpreet Bhamra Singh, Parthive Patel, and the NYC Transportation

Regional Center, LLC (collectively, the "Plaintiffs"), by and through their undersigned attorneys,

Morrison Cohen LLP, as and for their Complaint against Infinity Multiventures Inc. ("Infinity"),

Sanjay Dayman, Vaibhav Manek, and Sandeep Mehta (collectively, the "Defendants"), allege as

follows:

### NATURE OF ACTION

1.      This action has been made necessary because the individual defendants are holding

up a contractually required investment of money into a project, in order to squeeze out more money

for themselves.  In the meantime, the individual plaintiffs, three individual applicants in the EB-5 immigration program, are seeing their American dreams derailed because their applications depend on that money being invested into the project.  As long as the defendants do not release the money as they said they would, they are committing a breach of contract, as well as securities fraud.

2.      In late 2018, the individual Defendants, seeking additional capital to finance the construction of a pharmaceutical manufacturing plant, approached Mona Shah & Associates Global ("MSA Global") for assistance.  MSA Global specializes in EB-5 investments, a special immigration program under which immigrant investors may invest certain sums of money in projects that will create jobs and, in return, receive conditional permanent residency in the United States.  The EB-5 program also allows these investor immigrants to later seek permanent residence in the United States.

3.      In connection with the individual Defendants' request, MSA Global handled drafting the necessary agreements, incorporations and offering documents to memorialize and facilitate an EB-5 investment into the construction of the pharmaceutical manufacturing plant that was being completed for the benefit of Aarkish Pharmaceuticals LLC and its subsidiaries.

4.      The individual Defendants formed and took control of Defendant Infinity Multiventures Inc. ("Infinity"), a corporation created for the purposes of EB-5 investment.  In turn, Plaintiff NYC Transportation Regional Center, LLC ("NYCT Regional Center") entered into a Sponsorship Agreement with the newly-created Infinity Aarkish Multiventures LLC ("Infinity Aarkish"), which was formed to be the "new commercial enterprise" pursuant to the EB-5 regulations.  Infinity became the managing member of Infinity Aarkish.

5.      Infinity Aarkish's role in the EB-5 investment was key: under the relevant EB-5 regulations, it was to serve as the "new commercial enterprise," or the enterprise created by the EB-5 immigrant investors' funds.   Crucially, Infinity was tasked with managing the investors' funds and transferring them to the Aarkish subsidiaries that were managing the construction.

6.      By October 30, 2019, MSA Global had not only undertaken all of these necessary preparations for the EB-5 investment, but it had actually identified individual investors to participate and invest funds in the ongoing construction.   Three of the investors to provide funds to the project were the individually-named Plaintiffs:   Raj Patel, Ravpreet Bhamra Singh, and Parthive Patel.

7.      Each of the individual Plaintiffs invested $500,000 into the project, with the expectation that their funds would be transferred to Infinity Aarkish, who in turn would transfer the money to the project developers for use in the manufacturing plant construction (as required by the EB-5 immigration regulations).   EB-5 immigration petitions were submitted by all of the investors to the United States Citizenship and Immigration Services (USCIS) in reliance on this plan.

8.      By early 2020, however, it became clear that all was not going to plan.   While the investors, including the individual Plaintiffs, had provided the requisite funds and most of the funds had been transferred to Infinity Aarkish, only a small fraction of the EB-5 funds had been released to the Aarkish subsidiaries overseeing the construction of the pharmaceutical manufacturing plant.   This withholding was immediately problematic for the individual Plaintiffs – if the EB-5 investors' funds were not released to the Aarkish subsidiaries prior to the completion of the manufacturing plant, the funds would no longer entitle the investors to EB-5 status under the United States' immigration rules and regulations.

9.      Upon further investigation, in February 2020, it was discovered that Defendant Infinity, in its role as managing member of Infinity Aarkish, had a specific, insidious motive for not authorizing the release of the EB-5: it was seeking to leverage its control over the release of the funds to force the project developers to pay additional fees to the Defendants for their role in originating the EB-5 investment.  (The project developers have recently filed a separate lawsuit against Infinity, making similar allegations.)

10.      Worse still, Defendants' withholding of the EB-5 funds is not only wrongful, but it also violates the agreements that Infinity and Infinity Aarkish entered into for the purposes of procuring an EB-5 investment, as well as the offering documents that were used to solicit EB-5 investors.

11.      Since learning of the Defendants' plan and motive, MSA Global and the Plaintiffs have attempted to convince the Defendants to live up to their contractual obligations under the EB-5 agreements and release the EB-5 funds to the project developers.  To date, that has not occurred.

12.      The Defendants' wrongful withholding of the funds for the project endangers the individual Plaintiffs' EB-5 immigration petitions, and along with it, their entitlement to conditional permanent residence in the United States, despite the efforts the individual Plaintiffs have put forth to comply with the relevant immigration rules and regulations.

13.      Accordingly, Plaintiffs request that this Court hold the Defendants accountable for violating their contractual obligations, withholding the EB-5 funds that rightfully should be released to the project developers, and committing securities fraud, all to the detriment of Plaintiffs.

## **PARTIES**

14.      Plaintiff Raj Patel is an Indian national residing in India.

15.    Plaintiff Ravpreet Bhamra Singh is an Indian national residing in New Jersey.

16.    Plaintiff Parthive Patel is an Indian national residing in India.

17.    Plaintiff NYC Transportation Regional Center, LLC is a New York limited liability company with its principal place of business in New York City.

18.    Defendant Infinity Multiventures Inc. is a Delaware corporation with its principal place of business in New Jersey.

19.    Defendant Sanjay Dayman is an Indian national, residing in India.

20.    Defendant Vaibhav Manek is an Indian national, residing in India.

21.    Defendant Sandeep Mehta is an Indian national, residing in India.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), and Section 27 of the Exchange Act (15 U.S.C. §§ 78u(e) and 78aa), because Plaintiffs allege violations of Section 10 of the Exchange Act and Rule 10-b5 thereunder.

23.    This Court has supplemental jurisdiction over Plaintiffs' common law breach of contract claim pursuant to 28 U.S.C. § 1367(a), because the fraud claim is so related to Plaintiffs' claims under the Exchange Act that it forms part of the same case or controversy.

24.    This Court has personal jurisdiction over the Defendants because they have had sufficient minimum contacts with this forum and, moreover, have purposefully availed themselves of the benefits and protections of the laws of this forum.

25.    Venue is proper here pursuant to 28 U.S.C. § 1391 because this judicial district is one "in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."

## FACTS COMMON TO ALL COUNTS

A.     THE EB-5 PROGRAM

26.     The Immigration and Nationality Act (INA) provides that a certain number of visas shall be made available by the United States Citizenship and Immigration Services (USCIS) for qualified individuals who have invested, or are in the process of investing, a sufficient amount of capital in projects that will "benefit the United States economy and create full-time employment for not fewer than 10 United States citizens or aliens lawfully admitted for permanent residence or other immigrants lawfully authorized to be employed in the United States."   8 U.S.C. § 1153(b)(5)(A).  A visa issued pursuant to this provision of the INA is referred to as an EB-5 visa.

27.     The amount of capital required to be invested by an EB-5 petitioner may be adjusted by the Attorney General of the United States.  8 U.S.C. § 1153(b)(5)(C)(i).  Currently, for petitions filed after November 21, 2019, a qualifying investor must invest at least one million eight hundred thousand dollars ($1,800,000).  8 C.F.R. § 204.6(f)(1).  However, if the qualifying investor is investing in a "targeted employment area," a place with an unemployment rate one hundred and fifty (150) percent greater than the national average, a qualified investor is only required to invest at least nine hundred thousand dollars ($900,000).  8 C.F.R. § 204.6(f)(2).

28.     To prove that they have invested the requisite amount of capital, an EB-5 petitioner must be able to show the "actual commitment" of the invested funds, including by way of bank statements, invoices, sales receipts, purchase contracts, USCIS commercial entry documents, bills of lading, evidence of money transfers, promissory notes and/or loan agreements.  8 C.F.R. §§ 204.6(j)(2)(i)-(v).  An EB-5 petitioner must also demonstrate the source of the invested funds.  *See* 8 C.F.R. § 204.6(j)(3).

29.     In addition to demonstrating that they have invested the requisite amount of capital, an EB-5 petitioner must demonstrate that their investment has created a "new commercial

enterprise." *See* 8 C.F.R. §§ 204.6(h), (j).  To make this showing, an EB-5 petitioner must include in their petition: (1) an organizational document for the new commercial enterprise, (2) a certificate or statement evidencing authority for an enterprise to do business in a state or municipality, or (3) evidence that the requisite investment has been transferred to an existing business such that there has been a forty (40) percent increase in the existing business's net worth or number of employees.  8 C.F.R. §§ 204.6(j)(1)-(3).  Multiple EB-5 petitioners may pool their investments into a single new commercial enterprise, and they may do so with capital provided by non-petitioners as well.  8 C.F.R. § 204.6(g)(1).

30.     In 1993, to assist potential EB-5 petitioners, Congress instructed the Secretary of State, together with the Attorney General, to set aside a number of EB-5 visas annually for use in a Pilot Immigration Program, whereby potential EB-5 petitioners could direct their investments into designated regional centers that would directly and indirectly create jobs.  *See* Pub. L. No. 102-395, § 610, 106 Stat. 1874 (Oct. 6, 1992).  Pursuant to this directive, the Immigrant Investor Pilot Program was codified in federal regulations, creating rules and regulations surrounding regional centers and their affiliation with potential EB-5 petitioners.  8 C.F.R. § 204.6(m)(3).

31.     To become a regional center, an enterprise is required to submit to USCIS (and be approved with respect to): (1) a description of how the regional center focuses on a geographic region of the United States and how it will promote economic growth, (2) verifiable detail regarding how jobs will be created indirectly through increased exports, (3) detailed statements regarding the amount and source of capital committed to the regional center, (4) detailed prediction of how the regional center will have a positive impact on the regional or national economy, and (5) a showing that the prediction is supported by economically or statistically valid forecasting.  *See* 8 C.F.R. §§ 204.6(m)(3), (4).

32.     If an EB-5 petitioner is successful in making these requisite showings to USCIS, they will receive an EB-5 visa, which will provide them conditional permanent residency (i.e. a Green Card valid for two years).  An EB-5 visa holder may then, in the ninety (90) days preceding the two-year anniversary of receiving the EB-5 visa, apply for the conditional basis of their lawful permanent resident status to be removed (i.e. become a lawful permanent resident).  8 C.F.R. § 216.6(a)(1)(i).

**B.     DEFENDANTS EXPRESS INTEREST IN EB-5 PROJECT**

33.     In late 2018, Defendants Sandeep Mehta, Sanjay Dayman, and Vaibhav Manek (styling themselves as Infinity Multiventures LLP), approached Mona Shah & Associates Global ("MSA Global"), a law firm specializing in the EB-5 program, regarding a construction project they were looking to further with Aarkish Pharmaceuticals LLC ("Aarkish Pharmaceuticals") and two of its subsidiaries.

34.     Aarkish Pharmaceuticals is the parent company of AACE Pharmaceuticals Inc. ("AACE Pharmaceuticals") and Aarkish Pharmaceuticals NJ Inc. (collectively, the "Job Creating Entities").  AACE Pharmaceuticals specializes in pharmaceutical manufacturing, research and development, packaging, and marketing of Oral Solid Dosage Forms including, but not limited to, Generic Rx and over-the-counter products.

35.     AACE Pharmaceuticals is located at 15 Gardner Road, Fairfield, NJ 07004. Aarkish Pharmaceuticals NJ Inc. is located at 8 Commerce Road, Fairfield, NJ 07004.

36.     The project on which Defendants were assisting was an $18 million development comprising the construction, development and operation of a general pharmaceutical manufacturing facility in two components at two sites (the "Aarkish Project").  Both sites will

focus on the production of controlled substance products and over-the-counter generic, contract manufacturing operations and branded drugs within the town of Fairfield, New Jersey.

37.     Despite having received some conventional financing, the Aarkish project required additional capital.  Defendants approached MSA Global to pursue receiving investments in the project from EB-5 investors, as MSA Global specializes in EB-5 investments and projects.

38.     As part of these initial discussions, the principals of MSA Global, Mona Shah and Rebecca Singh, informed the Defendants that, as part of their services offered, they could market the Aarkish Project to investors through Aria Strategies Group LLC ("ASG"), a separate corporation they created to identify and promote EB-5 projects.

39.     The principals of MSA Global also operated NYC Transportation Regional Center, LLC (the "NYCT Regional Center"), an EB-5 regional center approved and designated as such by USCIS on February 2, 2018.  The Regional Center was operated by principals of MSA Global to promote job creation and increase economic activity and participate in EB-5 projects in compliance with the EB-5 regulations.

40.     Shortly after their initial discussions of their needs for investors in the Aarkish Project, the individual Defendants (through their entity Infinity Multiventures LLP) and ASG partnered in creating a new entity,  Defendant Infinity Multiventures Inc. ("Infinity").[1]   The individual Defendants, through Infinity Multiventures LLP, control the operation of Defendant Infinity.

41.     In connection with this new partnership, the principals of MSA Global visited the new Aarkish Project in Fairfield, New Jersey, and met with the project developers, Atul Mehta and Ameet Vyas.   On the basis of this due diligence and their discussions with Defendants, MSA

---

[1]     ASG later withdrew from Infinity, due to an actual or apparent conflict.

Global drafted the EB-5 offering documents and I-526 petition package for investor submissions to USCIS.

42.     The offering documents for the EB-5 project contemplated the private placement of limited liability company interests in Infinity Aarkish Ventures LLC, the "new commercial enterprise" under the EB-5 regulations.  The offering documents included a Subscription Booklet, a Confidential Private Placement Memorandum, and a Comprehensive Business Plan.

## C.      THE EB-5 PROJECT MOVES FORWARD

43.     Following the completion of the EB-5 offering documents and the I-526 petition package, a new entity, Infinity Aarkish Ventures LLC ("Infinity Aarkish"), was formed by the parties working towards the EB-5 project.  In fact, Infinity Aarkish was formed to serve as the "new commercial enterprise" pursuant to the EB-5 regulations.  Upon its creation, Defendant Infinity was made the managing member of Infinity Aarkish.

44.     Following its creation, the NYCT Regional Center entered into a Sponsorship Agreement with Infinity Aarkish, dated July 19, 2019.

45.     This Sponsorship Agreement specified that Infinity Aarkish Ventures LLC ("Infinity Aarkish") – which, as discussed above, was the "new commercial enterprise" created pursuant to the EB-5 regulations – would be sponsored by the NYCT Regional Center under the EB-5 investor program.  Pursuant to this Sponsorship Agreement, Infinity Aarkish agreed to (1) provide to the NYCT Regional Center and USCIS all services necessary to allow the NYCT Regional center to comply with the laws and rules and regulations of USCIS, (2) obtain, as necessary, a letter indicating that the Aarkish Project was in a "targeted employment area," (3) comply with all the requirements of the EB-5 regulations, policies and procedures, (4) perform all

other duties related to the Aarkish Project, and (5) pay all administrative costs, as well as costs to prepare EB-5 immigrant petitions in connection with the Aarkish Project.

46.     Thus, pursuant to the Sponsorship Agreement, Infinity Aarkish agreed that it would take all the necessary steps to further the Aarkish Project and any future EB-5 investor petitions assembled in connection with the Aarkish Project.

47.     Shortly thereafter, in late July 2019, Infinity Aarkish entered into two Loan Agreements with the Job Creating Entities.  Pursuant to these Loan Agreements, Infinity Aarkish effectively would be responsible for receiving the EB-5 funds from the investors and releasing it to the Job Creating Entities.

48.     Specifically, both Loan Agreements specified that each of the Job Creating Entities would receive a loan from Infinity Aarkish that was "dependent on the successful offering of Units of membership interests by [Infinity Aarkish] pursuant to the [U.S. EB-5 Immigrant Investor Program], including approval by [USCIS] of Alien Entrepreneur Petitions (I-526) pursuant to Section 203(b)(5) of the Immigration and Nationality Act, as amended."

49.     These Loan Agreements did not leave the disbursement of funds to the Job Creating Entities to the discretion of Infinity Aarkish, or its managing member, Defendant Infinity.  To the contrary, both Loan Agreements clarified that Infinity Aarkish had agreed to make loans with a "Minimum Loan Amount" of $500,000.00, which would close as soon as the amount was made available by way of the successful offering of the aforementioned membership interests in Infinity Aarkish (i.e. as soon as the EB-5 investors funds were received by Infinity Aarkish).

50.     Thus, again, Infinity Aarkish, and its managing member, Defendant Infinity, agreed to ensure that the funds they received from EB-5 investors were disbursed to the Job Creating Entities for use in the Aarkish Project.

51.     Months later, MSA Global drafted two Shareholders Agreements, both of which became effective as of October 30, 2019.  The Shareholders Agreement was signed by and between Aarkish Pharmaceuticals and Infinity, among other parties.  Under the terms of these agreements, Infinity agreed to provide a total of $5,000,000, by way of ten EB-5 investors, in return for a twenty-five percent stake in each of the two Job Creating Entities, AACE Pharmaceuticals and Aarkish Pharmaceuticals NJ Inc.  Again, it is the Job Creating Entities who would actually use the EB-5 funds to create the requisite new jobs.

52.     To assist in holding and distributing investors' EB-5 funds, an escrow account was set up with Signature Bank.  Pursuant to the terms of the various agreements, Infinity, as the managing member of Infinity Aarkish, would be given control of the EB-5 funds after the EB-5 investors had deposited their capital in the escrow account.

53.     Thereafter, MSA Global presented the Aarkish Project to potential investors in an attempt to raise the necessary funds for the Aarkish Project.

54.     By October 2019, MSA Global had secured three EB-5 investors who are the above-named Plaintiffs:  Raj Patel, Ravpreet Bhamra Singh, and Parthive Patel.

55.     The initial offering raised approximately $2,700,000, short of the contemplated raise of $5,000,000, but sufficient to trigger the "Minimum Loan Amount" of each Loan Agreement between Infinity Aarkish and the Job Creating Entities.  These funds were deposited into the escrow account at Signature Bank.

**D.    EB-5 FUNDS ARE WITHHELD FROM THE EB-5 PROJECT EXPENDITURES**

56.     Shortly after their initial fundraising, the parties received an I-526 filing notice from USCIS.  Upon receipt of this notice, Signature Bank released approximately $2,350,000 to Infinity Aarkish (again, the "New Commercial Enterprise").

57.     The remaining $350,000 in the escrow account was withheld from release to await the official approval of the EB-5 petitions by USCIS.

58.     Of the $2,350,000 in funds that were released to Infinity Aarkish to be transferred to the Job Creating Entities pursuant to the Loan Agreement, only $850,000 were released by Infinity (as the managing member of Infinity Aarkish). These transfers occurred in December 2019 and January 2020. The remainder of the released funds (approximately $1,500,000) were withheld from being put towards project expenditures.

59.     The withholding of the EB-5 funds from the Aarkish Project threatens the immigration status of the EB-5 investors, as the EB-5 investors will be required by USCIS to demonstrate that there was a nexus between the EB-5 funds and the completion of the Aarkish Project (and the jobs created by the Aarkish Project).

**E.     DEFENDANTS WITHHOLD EB-5 FUNDS TO RECEIVE FEES FROM PROJECT DEVELOPER**

60.     In February 2020, Rebecca Singh, a partner of MSA Global and a managing member of the NYCT Regional Center, met with the individual Defendants in India to discuss why they were withholding the EB-5 funds that had been deposited from escrow to the NCE account to the relevant Job Creating Entity that Infinity controlled, to be used in the Aarkish Project. Throughout the month, the Job Creating Entities were continually requesting the release of the withheld funds to move the project forward. In this conversation, the individual Defendants alleged that the Job Creating Entities and Aarkish Pharmaceuticals were disregarding the Confidential Private Placement Memorandum ("PPM") by not providing adequate disclosure regarding the project's use of the $850,000 already released by the Defendants to the Job Creating Entities and Aarkish Pharmaceuticals.

61.    Contrary to Defendants' allegations, however, the PPM – written with the assistance of information from the Defendants – clearly states that the EB-5 funds are to be released to the Job Creating Entities.  In fact, it states specifically that the Job Creating Entities "will use the funds to construct, develop, equip, staff, launch and operate a general pharmaceutical manufacturing facility in two components at two sites focusing on the production of controlled and non-controlled prescription products and over-the-counter ('OTC') generic, Contract Manufacturing Operations ('CMO') and branded drugs within the Fairfield, New Jersey area."

62.    Because the PPM is part of a private offering subject to most of the federal securities laws, if the EB-5 funds are used for any other purpose than that stated in the PPM, it would constitute a violation of the Securities Exchange Act of 1934.

63.    Upon information and belief, in or around this same time period, the Defendants were embroiled in a dispute with the Job Creating Entities and Aarkish Pharmaceuticals over fees the individual Defendants they felt they were entitled to from the Aarkish Project.

64.    Upon information and belief, as a result of this dispute, the Defendants were attempting to leverage their refusal to release the EB-5 funds in an attempt to force the Job Creating Entities to pay to them these additional fees.

65.    Throughout March and April 2020, once MSA Global learned of this dispute, MSA Global continued to work with the Defendants, the Job Creating Entities and Aarkish Pharmaceuticals to try to resolve the fee dispute between the Defendants and the Job Creating Entities.

66.    In these discussions, the Defendants have continued to allege that the Job Creating Entities are violating the PPM, despite the fact that the Job Creating Entities have, since the release

of the $850,000 to be used for project expenditures, provided updates and invoices demonstrating the progress of the Aarkish Project and the use of the EB-5 funds.

67.     Upon information and belief, the Defendants' reason for withholding the EB-5 funds from being released to the project is entirely pretextual; merely part of an extended effort by the Defendants to receive additional fees from the Job Creating Entities for the Defendants' role in helping originate the EB-5 investment.

68.     Thus, contrary to the Defendants' contention, the remaining $1,500,000 of the EB-5 funds that have still not been released to the Aarkish Project should be released to the Aarkish Project, as the Defendants have no valid basis to withhold the EB-5 funds.

**F.     PLAINTIFFS ARE DAMAGED BY DEFENDANTS' REFUSAL  TO RELEASE THE FUNDS**

69.     As the Defendants have continued to withhold the EB-5 funds, the Aarkish Project itself has moved forward through its independent financing.   Originally, the construction contemplated by the project was to have been completed in late May 2020.   Due in part to the withholding of the EB-5 funds, the Aarkish Project procured additional bridge financing and is now scheduled to be completed imminently.

70.     Because the project is moving forward, the EB-5 investors, including the individual Plaintiffs, have become involved in the dispute between the Defendants, the Job Creating Entities and Aarkish Pharmaceuticals.   The immigration statuses of the individual Plaintiffs are entirely contingent on the imminent release of the improperly withheld EB-5 funds.

71.     If the Aarkish Project is completed prior to the release of the EB-5 funds, the investors, including the individual Plaintiffs, will not be able to demonstrate a nexus between the funds they provided to the Aarkish Project and the creation of the requisite jobs.   As such, the

Defendants' extortionate withholding of EB-5 funds has imminently jeopardized the individual Plaintiffs' immigration status before USCIS and their potential to receive green cards.

72.     Moreover, the individual Plaintiffs are unable to redeploy their investments to other EB-5 projects, as their EB-5 immigration petitions have already been filed with USCIS.  Were the individual Plaintiffs to redeploy their funds to another project, USCIS would deny their petitions on the grounds that this redeployment would constitute a "material change" to the EB-5 petitions. EB-5 regulations prohibit "material" changes to an immigrant investor's petition.

73.     Worse yet, when the individual Plaintiffs provided their EB-5 funds, the EB-5 regulations only provided that the minimum investment for an EB-5 investor was $500,000.  Now, as described above, the new regulations require an EB-5 investor to put forth at least $900,000.

74.     Thus, were the individual Plaintiffs to even pursue another EB-5 project and petition in the future, they would have to do so at a considerably steeper minimum investment.

75.     Plaintiff NYCT Regional Center has also been damaged by the Defendants' refusal to release the EB-5 funds because Defendants' refusal is in direct violation of the Sponsorship Agreement that NYCT Regional Centered entered into with Infinity Aarkish (which is managed by Defendant Infinity).

76.     Despite repeated attempts by MSA Global and the Plaintiffs to get Defendants to release the EB-5 funds as required by the agreements between the parties, Defendants continue to inaccurately assert that the project developers have violated the PPM.

77.     On August 4, 2020, the Plaintiffs and MSA Global sent the Defendants an e-mail demanding the release of the funds.  Since that e-mail, Defendants have insisted that they intend to release the funds as required for Plaintiffs' EB-5 funds, but insist that additional monetary

transfers involving separate bank accounts are required first before the funds can be released to the Aarkish Project.

78.    These transfers requested by Defendants  would not only violate USCIS regulations that require funds to be routed directly from the business most closely responsible for creating the jobs created underlying a EB-5 petition, but the transfers also would involve transfers likely to implicate money-laundering concerns.

79.    Defendants themselves refused to have phone calls or video-conferences to discuss their refusal to release the funds and/or their proposed conditions for doing so (i.e. additional monetary transfers and fees to be paid by the project developers).  Instead, Defendants have, in bad faith, failed to work towards any resolution of their refusal to release the funds to the Aarkish Project.  A United States-based attorney for Defendants attempted to intermediate, but these attempts have also been unsuccessful in getting the Defendants to release the funds.

80.    Thus, the Defendants have continued to withhold the EB-5 funds as part of their continued attempt to leverage holding these funds into receiving additional fees from the Job Creating Entities and Aarkish Pharmaceuticals.  As a result, Defendants have left the Plaintiffs no choice but to come to this Court to seek relief.

81.    On October 26, 2020, Aarkish Pharmaceuticals (and an affiliate) filed suit against Defendants (and an affiliated LLC) in this Court, alleging fraud and other wrongdoing against the Defendants relating to the project.  *See AACE Pharmaceuticals Inc. v. Infinity Multiventures Inc.*, No. 20-cv-14998 (D.N.J.), Dkt #1 (Oct. 26, 2020).

82.    The Defendants have since demanded that NYCT Regional Center release to the Defendants administrative fees paid by the investors, in breach of both securities laws and a Regional Center rental agreement.  By letter of November 19, 2020, Defendants demanded the

return of certain escrowed monies, making baseless and nonsensical claims that MSA violated state and federal laws, and threatening to reiterate these baseless and nonsensical claims to various federal and state regulators, as well as to the New York Bar.

83.     Obviously, such a payment of investors' funds would be a breach of securities laws (in particular broker-dealer regulations), and Defendants' fiduciary duties, and thus cannot occur, regardless of any extortionate threats made by Defendants.  Defendants' highly improper threats – pay us or we will make false accusations about you to law enforcement – simply underline Defendants' bad faith throughout this process.

**FIRST COUNT**
**(Breach of Contract)**

84.     Plaintiffs repeat and reallege every aforementioned allegation as if set forth at length herein.

85.     The Defendants approached MSA Global in an attempt to find and procure EB-5 investors to provide financing to the Aarkish Project.

86.     The Defendants, through Defendant Infinity, entered into a Sponsorship Agreement, Loan Agreement, and Shareholders Agreement, all of which delineated the procedures for ensuring that the EB-5 funds from the EB-5 investors would be transferred to the new commercial enterprise, Infinity Aarkish, before being transferred to the Job Creating Entities for use in the Aarkish Project.

87.     Individual Plaintiffs, as the EB-5 investors who ultimately provided funds to be directed to the Aarkish Project, were intended third-party beneficiaries to these agreements, as provided for by N.J. Stat. § 2A:15-2.

88.     Plaintiff NYCT Regional Center was a party to a Sponsorship Agreement with Infinity Aarkish, which is managed by Defendant Infinity.

89.     Moreover, to attract the EB-5 investors, including Plaintiffs, the Defendants drafted and approved offering documents (including a Private Placement Memorandum consistent with Regulation D and Regulation S under the Securities Act of 1933) that specifically stated that the funds put forth by the EB-5 investors would be used in connection with the Aarkish Project.

90.     None of the agreements, nor the offering documents, empowered the Defendants or Defendant Infinity, as managing member of Infinity Aarkish, to prevent EB-5 funds from being transferred by Infinity Aarkish to the Job Creating Entities for use in the Aarkish Project.

91.     In fact, all of the agreements that the Defendants agreed to as the managing member of Infinity Aarkish *require* the EB-5 funds to be released to the Job Creating Entities.

92.     For example, the Loan Agreements between Infinity Aarkish and the Job Creating Entities required Infinity Aarkish to disburse the investors' EB-5 funds as they were received by Infinity Aarkish.  Without any basis, Defendants have caused Infinity Aarkish to breach the Loan Agreements.

93.     Moreover, by entering into the Sponsorship Agreement with the NYCT Regional Center, Defendants agreed that they would (1) provide to the NYCT Regional Center and USCIS all services necessary to allow the NYC Regional center to comply with the laws and rules and regulations of USCIS, (2) obtain, as necessary, a letter indicating that the Aarkish Project was in a "targeted employment area," (3) comply with all the requirements of the EB-5 regulations, policies and procedures, (4) perform all other duties related to the Aarkish Project, and (5) pay all costs to prepare EB-5 immigrant petitions in connection with the Aarkish Project.

94.     Nevertheless, Defendants have refused to release $1,500,000 of EB-5 funds to the Job Creating Entities for use in the Aarkish Project.  Defendants have withheld these funds by not authorizing their release from Infinity Aarkish to the Job Creating Entities.

95.     Upon information and belief, Defendants are withholding funds to try to force the Job Creating Entities and Aarkish Pharmaceuticals to pay additional fees to Defendants in connection with their origination of the Aarkish Project and/or the EB-5 investment in the Aarkish Project.

96.     Thus, the Defendants improperly have withheld funds from the Job Creating Entities, in breach of the Sponsorship Agreement, the Loan Agreement, and the Shareholders Agreement.

97.     Given the clear and unambiguous language of the relevant agreements and Defendants' obviously improper motive for withholding the release of the EB-5 funds, ordering the Defendants to release the improperly withheld EB-5 funds, would pose no undue, disproportionate or inequitable burden upon the Defendants.

98.     The Individual Plaintiffs are sustaining serious harm as  result of the Defendants' actions, as the Defendants' refusal to release the Individual Plaintiffs' funds to the Job Creating Entities have jeopardized the individual Plaintiffs' immigration status.  If the EB-5 funds are not released to the Job Creating Entities, the individual Plaintiffs will be unable to prove, as required by federal regulations and USCIS, a nexus between their provided funds and the Aarkish Project and/or the jobs the Aarkish Project has created.

99.     Plaintiff NYCT Regional Center is also suffering harm as a result of Defendants' actions, which have not only jeopardized the EB-5 investment that the NYCT Regional Center was created to facilitate (with USCIS approval), but NYCT Regional Center now faces a considerable risk of litigation as a result of Defendants' actions.

100.    Moreover, NYCT Regional Center is also a party to a Sponsorship Agreement with Infinity Aarkish, pursuant to which Defendants are causing Infinity Aarkish to breach its

obligations, as the Sponsorship Agreement requires Infinity Aarkish to take all actions necessary in support of the Aarkish Project and the EB-5 investors providing funds for use in the Aarkish Project.

101.    Money damages are an inadequate remedy in light of the unique nature of the harms being done to the Plaintiffs.

102.    Accordingly, Plaintiffs seek a decree against the Defendants in the form of specific performance of the Sponsorship Agreement, Loan Agreement, and Shareholders Agreement by the entry of a preliminary and permanent injunction causing the Defendants to release the improperly withheld EB-5 funds to the Job Creating Entities for use in the Aarkish Project.

## SECOND COUNT
### (Violation of Section 10(b) of the Securities Exchange Act of 1934)

103.    Plaintiffs repeat and reallege every aforementioned allegation as if set forth at length herein.

104.    This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, against all Defendants.

105.    The investments described herein were an investment contract, and thus subject to United States securities laws, specifically the Securities Exchange Act of 1934.

106.    Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, employed devices, schemes, or artifices to defraud, and engaged in acts, practices, and courses of business which operate or would operate with fraud or deceit.

107.    Specifically, the Defendants approached MSA Global in an attempt to find and procure EB-5 investors to provide financing to the Aarkish Project.  The Defendants then provided false statements to MSA Global specifically for inclusion in the PPM, namely, that the Job

Creating Entities "will use the funds to construct, develop, equip, staff, launch and operate a general pharmaceutical manufacturing facility in two components at two sites focusing on the production of controlled and non-controlled prescription products and over-the-counter ('OTC') generic, Contract Manufacturing Operations ('CMO') and branded drugs within the Fairfield, New Jersey area."

108.   The Defendants did no such thing.  Instead of deploying the funds into the project, the Defendants used the funds – and the individual investors' green card status – as collateral to extract higher fees for themselves.

109.   Defendants knew those statements were false at the time they were made, or knew that the information they were omitting was required to make the information they did disclose not materially misleading.  Their pattern of behavior raises a strong inference that they knew at the time they made these statements about the use of funds that they would only deploy the funds if certain conditions were met – namely, the condition that they get paid an extra amount, undisclosed to the investors, and out of the investors' control.

110.   These statements about the use of funds were included in the PPM, and given to the investors, who relied on them in making their investments.

111.   As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs have suffered damages in connection with their investment.

**WHEREFORE**, Plaintiffs Raj Patel, Ravpreet Bhamra Singh, Parthive Patel, and the NYC Transportation Regional Center LLC demand judgment against Infinity Multiventures Inc., Sanjay Dayman, Vaibhav Manek, and Sandeep Mehta, as follows:

       a.      Judgment in favor of the Plaintiffs and against Defendant, on the First Count of the Complaint;

b.       Judgment in favor of the Plaintiffs and against Defendant, on the Second
Count of the Complaint;

c.       With respect to the First Count, an order granting the Plaintiffs specific
performance of the Loan Agreements and Sponsorship Agreement, both of
which require Infinity Aarkish to release the EB-5 funds to AACE
Pharmaceuticals Inc. and Aarkish Pharmaceuticals NJ Inc., or, in the
alternative, an order granting Plaintiffs monetary damages in an amount to
be proven at trial;

d.       With respect to the Second Count, an order granting Plaintiffs monetary
damages in an amount to be proven at trial;

e.       An order granting Plaintiffs their reasonable attorneys' fees, costs and
disbursements;

f.       An order granting Plaintiffs such other and further relief as deemed just
and proper.

Dated:  November 25, 2020
        New York, New York

                                **MORRISON COHEN LLP**

                                By:___*/s/ Alvin C. Lin*_____
                                        Alvin C. Lin (ID: 017502000)
                                        Jason P. Gottlieb (pro hac vice forthcoming)
                                        Collin A. Rose (pro hac vice forthcoming)
                                        909 Third Avenue
                                        New York, New York 10022
                                        (212) 735-8600

                                *Attorneys for Plaintiffs Raj Patel, Ravpreet*
                                *Bharmra Singh, Parthive Patel, and NYC*
                                *Transportation Regional Center LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

RAJ PATEL, RAVPREET BHAMRA SINGH,
PARTHIVE PATEL, and NYC TRANSPORTATION
REGIONAL CENTER, LLC,

                Plaintiffs,

   -against-

INFINITY MULTIVENTURES INC., SANJAY
DAYMAN, VAIBHAV MANEK, and SANDEEP
MEHTA,

                Defendants.

No.:

**VERIFICATION**

STATE OF NEW YORK    )
                         ) ss.:
COUNTY OF NEW YORK  )

        MONA SHAH, being duly sworn, deposes and says:

        I have personal knowledge of the facts, and I have reviewed the allegations of the

Complaint being filed in this action, and I believe them to be true to the best of my own

knowledge and belief.

        I affirm the foregoing to be true and correct under penalty of perjury this __th day

of November, 2020.

_____
MONA SHAH

Sworn to before me this
24th day of  November, 2020

_____
Notary Public

KATHRYN M. BROADBENT
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01BR6150587
Qualified in New York County
Commission Expires July 31, 2022

24